IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID WILLIAM LITTERAL, | ) | |
| | ) | |
| PLAINTIFF, | ) | No. 3:13-00561 |
| | ) | Judge Nixon/Bryant |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

This is a civil action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration (SSA), through its Commissioner, as set out by the Administrative Law Judge (the ALJ), denying the plaintiff's application for disability insurance benefits (DIB). This case is currently pending on the plaintiff's motion for judgment on the administrative record (Docket Entry (DE) 12), to which the defendant has responded (DE 16). The plaintiff has filed a reply (DE 18). Upon consideration of these documents and the administrative record (DE 9),[1] and for the reasons stated below, the Magistrate Judge recommends that the plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

## I.     Introduction

The plaintiff protectively filed for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act) on April 29, 2011 (Tr. 219). He claimed an onset date of July

---

[1] Referenced herein by page number(s) following the abbreviation "Tr." Page numbers refer to the Bates Stamp.

30, 1997 and disability due to ischemic heart disease and post-traumatic stress disorder (PTSD) (Tr. 355; 373). The plaintiff was last insured on December 31, 1997 (Tr. 219; 362).

On August 22, 2011 the Commissioner denied the DIB claim (Tr. 301). On October 10, 2011, the plaintiff timely filed for reconsideration (Tr. 310). On October 20, 2011, the Commissioner again denied the claim (Tr. 311). On November 11, 2011, the plaintiff timely requested a de novo hearing of his claim by an ALJ (Tr. 314). On August 31, 2012, through his counsel, the plaintiff filed an on the record request, which was not granted (Tr. 324).

On October 19, 2012, the plaintiff appeared before ALJ, Brian Dougherty (Tr. 233). Also appearing were: (1) Brenda Benson (Ms. Benson), the plaintiff's attorney; and (2) Michelle McBroom-Weiss, the vocational expert (VE) (Tr. 233). On November 30, 2012, the ALJ decided that the plaintiff was not disabled under Title II of the Act (Tr. 216). The decision of the ALJ contains the following enumerated findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Act on December 31, 1997.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 30, 1997 through his date last insured of December 31, 1997 (20 CFR 404.1571 *et seq.*).

3. The claimant had the following severe impairments: coronary artery disease with myocardial infarction in July 1997, ischemic cardiomyopathy with five-vessel coronary artery bypass grafting (CABG) in August 1997, stable coronary artery disease, hypertension, colon polyp, and PTSD as diagnosed several years after the date last insured (20 CFR 404.1520(c)).

4. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the ALJ finds that, through the date last insured, the claimant had the residual functional capacity [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a); lift and/or carry 10 pounds occasionally; stand and/or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday; with the ability to understand, remember and carry out simple instructions and tasks with adequate concentration, persistence and pace, the ability to

have occasional contact with the public, co-workers, and supervisors; and the ability to tolerate gradual and infrequent change.

6. The claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was 48 years old on the date last insured, which is defined as a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has a high school education with one year of college, and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Act, at any time from July 30, 1997, the alleged onset date, through December 31, 1997, the date last insured (20 CFR 404.1520(g)).

(Tr. 221; 223; 227-29).

On April 23, 2013, the Appeals Council (AC) denied the plaintiff's request for review of the ALJ's decision (Tr. 1-6). On June 10, 2013, the plaintiff timely brought the instant action (DE 1). The matter is now properly before the Court.

## II. Review of the Record

### A. Relevant Medical Evidence

The plaintiff claimed an onset date of July 30, 1997 and his date last insured was December 31, 1997 (Tr. 219; 221). This renders medical evidence prior to December 31, 1997 both relevant and necessary for establishing disability. *See* 42 U.S.C. §§ 423(a) and (c). This also presented a particularly "short window in which to prove disability." (Tr. 224).

The earliest medical evidence is one echocardiogram report from August 01, 1997 that was not actually entered or signed until December 11, 1999 (Tr. 676-77). The physician

reporting the results of the echocardiogram described it as a "[t]echnically very difficult study of poor quality; normal sinus rhythm throughout." (Tr. 676). Nonetheless, the ALJ reviewed and discussed later records at length (Tr. 224-27). Those records span from 2009 to 2012 (Tr. 421-525; 545-754). Through those records, it is apparent that the plaintiff had coronary artery disease and suffered a heart attack in August 1997 (Tr. 440). He was treated with stent placement and then underwent a quintuple CABG (Tr. 440). The plaintiff reported being told that "he had a 'silent heart attack' prior to [August 1997]" as well (Tr. 440).

The plaintiff's medical records are briefly reviewed below to the extent that they make a reference to the plaintiff's 1997 heart attack or contemporaneous coronary artery disease, or to the plaintiff's PTSD.

In March 1999, the plaintiff presented to Physician's Assistant, Gary Ungar (Mr. Ungar) at Tennessee Valley Health Care System. Mr. Ungar documented that the plaintiff was "last seen [December 1998] for history of [heart attack], CABG, hypertension, and increased lipids…No new problems. Denies any chest pain or [shortness of breath on exertion]. Works out doors daily without problems." (Tr. 675).

In December 2006, the plaintiff presented to Mr. Ungar, who documented that the plaintiff had not been seen "in clinic for almost 2 years." (Tr. 590). He noted that the plaintiff's coronary artery disease was stable (Tr. 590).

In December 2009, the plaintiff presented to Dr. Andrew Lenneman (Dr. Lenneman) (Tr. 515). Dr. Lenneman diagnosed the plaintiff with stable ischemic cardiomyopathy, hypertension with well controlled blood pressure, and poorly controlled hyperlipidemia (Tr. 515).

The plaintiff presented to cardiologist, Dr. John Nadeau, M.D. (Dr. Nadeau) in August, October, and December 2010, September and December 2011, and March and June 2012 with

complaints of, inter alia, "non-specific, severe pain if he does anything physical: arms, chest, stomach muscles, back." (Tr. 475; 486; 498; 697; 707; 724; 731). Dr. Nadeau documented the plaintiff's history of a knee operation in the 1970's and removal of a fibroma in 1987 (Tr. 502).

In March 2010, the plaintiff presented for a compensation and pension examination (Tr. 505). The medical records review therein documented the plaintiff's coronary artery disease beginning in 1997 that has been "progressively worse." (Tr. 506). The provider documented the plaintiff's hypertension, which required medication, and the plaintiff's heart disease, which did not require medication (Tr. 506). The plaintiff's date of retirement was listed as 1997, due to the heart attack the same year (Tr. 510). He was diagnosed with coronary artery disease and the provider documented that this had no "effect on usual occupation and resulting work," although it did have a moderate effect on chores, exercise, and sports, as well as a mild effect on recreation and traveling (Tr. 510).

In October 2010, the plaintiff presented to Dr. Michael Propper, M.D. (Dr. Propper) for a psychiatric evaluation on referral from Dr. Nadeau (Tr. 488). Dr. Propper reported that he reviewed the records of Dr. Nadeau, in which Dr. Nadeau reported that the plaintiff has "untreated PTSD that has been exacerbated by his recent [A]gent [O]range disability evaluation. He had never been in treatment. He has [artherosclerotic heart disease] with an ischemic cardiomyopathy that is stable at present." (Tr. 488). Dr. Propper documented that the plaintiff had, inter alia, a "depressive [not otherwise specified]" diagnosis (Tr. 492). He prescribed medication and recommended support group counseling (Tr. 492).

In November 2010, the plaintiff reported that "irritability has been a major problem affecting his daily living including employment since returning from Vietnam." (Tr. 479). In May 2011, the plaintiff reported experiencing PTSD "since his return from Vietnam." (Tr. 432).

The plaintiff was awarded Veteran's Affairs (VA) disability in August 2009 for "coronary artery disease with ischemic cardiomyopathy with history of [heart attack] and CABG associated with herbicide [Agent Orange] exposure" and in February 2010 for PTSD (Tr. 679; 681).

### B.       Other Medical and Psychiatric Assessments

On August 04, 2011, Rebecca Joslin, Ed.D. completed a psychiatric review (Tr. 526-38). She reported that there was "[n]o mental MER available for DIB timeframe. [I]nsufficient evidence to assess." (Tr. 538). On August 16, 2011, Dr. Reeta Misra, M.D. (Dr. Misra) completed a medical consultant analysis on behalf of Tennessee Disability Determination Services (DDS) (Tr. 540-44). Dr. Misra reported that the VA records before her were from December 15, 2009 through June 06, 2011 and were "technically insufficient." (Tr. 540; 544).

### C.       Testimonial Evidence

### 1.       Plaintiff Testimony

The plaintiff testified on direct examination by the ALJ that he was 63 years old, 5 feet 8 inches, that he weighed 199 pounds, and weighed about 158 pounds in 1997 (Tr. 236-37). The plaintiff testified that he does not smoke now, but that he did smoke one pack per day in 1997 (Tr. 237). He testified that he stopped smoking after his heart attack (Tr. 237). The plaintiff testified that he had not had "any issues with regard to abusing alcohol or any other drugs…for years." (Tr. 238). The plaintiff testified that at the time of his heart attack in 1997, he was doing interior and exterior contract painting, and that he was "already sick." (Tr. 238).

Next, the ALJ and Ms. Benson discussed that this is a "difficult case…because the alleged onset date is…[a]lmost 15 years ago…there are some records that go back prior to 1997.[2]

---

2 The Magistrate Judge notes the discrepancy between this statement and the record which contains one record from an echocardiogram in August 1997, reported in 1999 (Tr. 676-77). However, the parties do not raise any contention about this point or cite any evidence prior to 1999. The Magistrate Judge construes this statement to mean that there were records prior to the date last insured of December 31, 1997.

There are records that are more recent…." (Tr. 238). The ALJ then asked Ms. Benson for an opening statement to establish the case (Tr. 239). Ms. Benson responded that the plaintiff had a "massive heart attack with a 5 vessel bypass that caused major damage to his heart [that] happened in 1997, and he had an [e]jection fraction near listing level still in 2011." (Tr. 239). The ALJ asked if there were "any records" of this from 1997 and noted that coronary artery disease is progressive in nature (Tr. 239). Ms. Benson did not respond before the ALJ noted that the plaintiff "does have…PTSD," but that there were no records of "any treatment of PTSD back in 1999"[3] and that the case seems "mostly based on the heart attack." (Tr. 239-40). The ALJ explained that, in this case, he would be using more than the medical-vocational guidelines in 20 CFR Part 404, Subpart P, Appendix 2, known as "the grid." 20 C.F.R. § 404.1569.[4]

Ms. Benson explained that the plaintiff "[did not] develop PTSD in 2010 or 2011…He obviously had it since the service…." (Tr. 240). The ALJ noted that the plaintiff worked after his service (Tr. 240). The ALJ again asked if there were treatment records that would support PTSD in 1997 (Tr. 240). Ms. Benson or the plaintiff responded, "No." (Tr. 240). The ALJ noted that he would "take some testimony on that issue." (Tr. 240).

Next, the ALJ again explained the difficulty of the case, telling the plaintiff, "you have to establish that you were not able to work in 1997." (Tr. 242). The plaintiff responded with, "Yes," "Right," and, "OK." (Tr. 242). The ALJ then asked the plaintiff if he had worked since 1997 (Tr. 243). The plaintiff testified that he had not worked "on a continual basis" and that he supported himself with the help of his wife and his mother's estate (Tr. 243). He testified that he tried to do painting but that his physicians told him "not to lift anything over [his] head." (Tr. 243). He

3 The Magistrate Judge construes this statement to refer to the lack of medical evidence in 1997.

4 *See infra* Part. III.B.

testified that he has "dizzy spells," cannot climb a ladder, and that since the heart attack, if he does "anything physical," he "[cannot] do anything for 3 or 4 days after that." (Tr. 243).

Next, the ALJ and Ms. Benson discussed the plaintiff's diagnoses in 1997 and that the records did not show that the impairments met or equaled one of the listings of impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii).[5] (Tr. 245).

The plaintiff testified on direct examination by Ms. Benson, who asked him to recall how his heart attack affected him (Tr. 246-47). The plaintiff testified, "I was in the hospital for a 3 week period of time when I had the massive heart attack. It just immobilized me, and in that 3 week period…I died five times while I was in the hospital. They kept bringing me back…." (Tr. 247). The plaintiff testified that when he left the hospital, he was unable to return to painting (Tr. 247). He testified that he had no strength in his legs and that he had to sit down after climbing a flight of stairs (Tr. 247). He testified that he had leg and foot pain as a "a side effect of taking the cholesterol medications and that sort of thing." (Tr. 247). The plaintiff testified that his inability to sleep worsened and that he "[could not] do the physical things that [he] could do in years past…." (Tr. 247). He testified that "some of it was psychological. I guess I [did not] want to die anymore. I [did not] want to have any more heart attacks." (Tr. 247). The plaintiff testified that he had and still experiences shortness of breath, chest pain, and pain in his legs, arm, and back (Tr. 248-49). He testified that his legs ache, his feet hurt, he has dizziness, he has fallen down, and he has nightly back spasms lasting 30-45 minutes (Tr. 248-49). He testified his arm and back pain "feels like it burns the inside of the muscle." (Tr. 249).

Ms. Benson asked the plaintiff, "[n]ot that this is necessarily relevant, but what did your doctor tell you after the heart attack…?" (Tr. 249). The plaintiff testified that a surgeon told him

---

5 *See infra* Part. III.B.

that he was "dead basically the whole time [he] was on the operating table…." (Tr. 250). The plaintiff testified that his cardiologist "wanted to implant a defibrillator…because [the plaintiff] was a perfect candidate for sudden death syndrome." (Tr. 250).

The plaintiff testified that he had vertigo "after the heart attack," and that after 30 minutes of walking, he would "have to take a break and sit down." (Tr. 250-51). The plaintiff testified that in 1997, he would have been able to stand for 30 to 45 minutes or sit for 30 to 60 minutes (Tr. 251). The plaintiff testified that these estimates of his abilities in 1997 were unchanged today (Tr. 251). The plaintiff testified that, as in 1997, he "wear[s] out very quickly." (Tr. 251).

Ms. Benson switched her questioning to focus on PTSD. She asked the plaintiff if he had the same symptoms in 1997 that he had when he was diagnosed with PTSD (Tr. 252). The plaintiff testified, "[I have] had those symptoms ever since I [came] home from Vietnam…I thought I was going nuts. Nightmares and inability to sleep…anger and fits of rage, depression isolating myself…not having friends." (Tr. 252). The plaintiff testified that he first filed for disability due to PTSD in 1992, but was denied (Tr. 252). He testified that he "finally…found somebody at the Vet Center…They knew what they wanted to hear at the VA and how…you had to present it to them, and it went right through." (Tr. 252). The plaintiff testified that PTSD affected his performance because he was unable to "fit in," had problems "with concentration and focusing," and that he "hate[s] any kind of change." (Tr. 253-54).

Next, Ms. Benson asked the plaintiff to explain why he did not file for disability until 2011 (Tr. 254-55). The plaintiff testified, "[w]hen I was in the hospital, my wife called the Social Security office and asked what she needed to do to start the process for filing a claim...and they…told her that there was no help available because [I had] had a heart attack." (Tr. 255).

The plaintiff testified that he did not recall telling anyone that he was able to engage in "bowling, canoeing, racquetball, fly fishing" and that he was not able to do those activities in 1997 (Tr. 255-56). The plaintiff testified that a typical day consists of "a little bit here and a little bit there…If I go to the store, I just go in and get what I want to get and get on out…." (Tr. 256). He testified that his wife does most of the household chores and that he does not often leave the house (Tr. 256). He testified that he gets short of breath and must take deep breaths (Tr. 257). The plaintiff testified that he has "been treated at the VA consistently since 1997 when [he] had the heart attack…." (Tr. 257). The ALJ asked the plaintiff if, in 1997, he would have been able to do a "sedentary job, such as sitting at a desk and staring at a surveillance camera all day for 40 hours a week?" (Tr. 257). The plaintiff testified that he could not because he could not "be confined." (Tr. 258).

Ms. Benson then asked the plaintiff if he had any side effects from his medication (Tr. 258). He testified that "the legs, the feet, the muscle spasms, the dizziness, a lot of that is attributed to the side effects of the medications." (Tr. 258). He testified that he was taking the same medications in 1997 "in some form or another…." (Tr. 258). He testified that he also thought he had a heart attack at age 24 (Tr. 258). The plaintiff testified that he had short term memory problems in 1997 (Tr. 259-60). The plaintiff testified that he currently watches the news, talks to veterans frequently, and participates with a foundation for veterans that he started (Tr. 260-61).

### 2. Vocational Expert Testimony

The VE testified that the plaintiff's past work as a painter was medium,[6] skilled[7] work with a SVP of 7.[8] (Tr. 246).

---

6 20 C.F.R. § 404.967 ("To determine the physical exertion requirements of work in the national economy, [jobs are classified] as ***sedentary, light, medium, heavy, and very heavy***.") (emphasis added).

The ALJ then presented the VE with a hypothetical scenario:

> A person 48 years old, at least a high school education…no past relevant work…the individual can perform physical activities at a full range of sedentary. From a mental standpoint, consider that the individual can understand, remember and carry out simple tasks and instructions with adequate concentration, persistence and pace. Can have only occasional interaction with the public, coworkers and supervisors. Can adapt to only gradual and infrequent change.

(Tr. 262). The VE testified that the plaintiff would be unable to perform his past relevant work under this hypothetical (Tr. 262). However, the VE testified that the plaintiff could perform work as (1) an electrical assembler, with 100 employed in Tennessee and 38,000 employed nationally in this job; (2) a hand trimmer, with 300 employed in Tennessee and 13,000 employed nationally in this job; (3) a sorter, with 400 employed in Tennessee and 14,000 employed nationally in this job; (4) a security system monitor, with 200 employed in Tennessee and 17,000 employed nationally in this job; and (5) an inspector, with 1,000 employed in Tennessee and 30,000 employed nationally in this job (Tr. 262-64).

The ALJ then presented the VE with a second hypothetical, including the same limitations as in the first (Tr. 264). Additionally, the ALJ asked the VE to consider a person who needs unpredictable breaks of at least 20 minutes, 4 to 5 times per week, even when sitting (Tr. 265). The VE testified that those limitations would prevent the plaintiff from performing the jobs listed "because of the frequency" of the breaks (Tr. 265). Likewise, the VE testified that the plaintiff could not perform those jobs if he were "off task 25 percent of the day" or if he "missed 3 or more days per month." (Tr. 267).

---

7 20 C.F.R. § 404.968 ("In order to evaluate [the plaintiff's] skills…occupations are classified as **unskilled, semi-skilled, and skilled**.") (emphasis added).

8 SSR 00-4P, 2000 WL 1898704 ("The Dictionary of Occupational Titles (DOT) lists a **specific vocational preparation (SVP)** time for each described occupation. Using the skill level definitions in 20 C.F.R. § 404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.") (emphasis added).

### III. Analysis

### A. Standard of Review

The issue before the Court, pursuant to 42 U.S.C. § 405(g), is limited to whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the ALJ applied the correct legal standards. *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli*, 390 F. App'x at 434 (quoting *Cutlip,* 25 F.3d at 286). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x at 434 (citation omitted).  If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if th[e] Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Carrelli*, 390 F. App'x at 434 (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

### B. Proceedings at the Administrative Level

Disability is defined for Title II DIB claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The ALJ uses a 5 step sequential evaluation to determine whether the plaintiff meets the definition of "disabled." 20 C.F.R. § 404.1520(a)(4)(i)-(v).

i.  If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii.  If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii.  If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 CFR Part 404, Subpart P, Appendix 1 and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv.  The court considers the plaintiff's RFC and past relevant work. If the plaintiff can still perform his past relevant work, the Court will find that he is not disabled.

v.  The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that he is not disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v).

The plaintiff has the burden of proof for steps 1 to 4. *Carrelli*, 390 F. App'x at 435. The burden shifts to the ALJ at step 5, where the ALJ must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Carrelli*, 390 F. App'x at 435 (citation omitted). To meet this burden, the ALJ may use the medical-vocational guidelines in 20 CFR Part 404, Subpart P, Appendix 2, known as "the grid." 20 C.F.R. § 404.1569; *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). The ALJ may use the grid as a guide or rely on it in reaching a conclusion, depending upon the characteristics of the plaintiff.

If a plaintiff does have nonexertional limitations that "restrict…[his] performance of a full range of work at the appropriate [RFC]," then these limitations must be considered and the grid may be used as a guide. *Wright*, 321 F.3d at 616 (quoting *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528-29 (6th Cir. 1981)). In those cases, "the ALJ [is] entitled to rely on the testimony of a [VE] in reaching his decision" as to whether the plaintiff is disabled or whether

the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004).

If the plaintiff does not have nonexertional limitations, and "the findings of fact made with respect to a[n]…individual's vocational factors and [RFC] coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)).

## IV. Plaintiff's Statement of Errors

### A. The ALJ failed to consider and weigh the disability determination of the Department of Veterans Affairs

The plaintiff argues that the ALJ erred by: (1) failing to consider the plaintiff's disability determination by the VA, including the determination of 100% disability, of individual un-employability, and that the plaintiff was homebound (DE 13, pp. 10-11). The plaintiff also argues that the ALJ erred by: (2) failing to afford any weight to that determination (DE 13, pp. 10-11). In doing so, the plaintiff argues that the ALJ violated both the "HALLEX II-1-11-12" provision and the relevant case law (DE 13, pp. 10-11). Implicit in these arguments is the assertion that the ALJ failed to address the consequences of the plaintiff's Agent Orange exposure during the Vietnam War and the plaintiff's PTSD (DE 13, p. 10).

To date, the Sixth Circuit has "held that a disability rating from the [VA] is entitled to consideration, but…[has] not specified the weight such a determination should carry when determining social security disability eligibility." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013) (citation omitted); See also *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 387-88 (6th Cir. 2013) (citation omitted). The regulations clarify that the appropriate weight is something less than binding because "[a] decision by…any other governmental agency

about whether [a plaintiff is]…disabled…is based on its rules and is not our decision….Therefore, a determination made by another agency that [a plaintiff is]…disabled…is not binding on us." 20 C.F.R. § 404.1504. Further, the Social Security Rulings (SSR)[9] indicate that "because other agencies may apply different rules and standards than…[an ALJ] for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency." SSR 06–03p, 2006 WL 2329939, at *7 (August 9, 2006).

However, case law cautions an ALJ against conflating the approaches that the VA and the SSA use to determine disability. An ALJ should be careful not to discount a VA determination on the justification that it includes "conditions not deemed severe in the social security context." *LaRiccia*, 549 F. App'x at 388. Likewise, an ALJ should be careful not to discount a VA determination because conditions are, in isolation, less than 100% disabling since "[d]isability in the social-security context 'may result from multiple impairments, no one of which alone would constitute a full disability [in the VA system].'" *LaRiccia*, 549 F. App'x at 388 (quoting *Loy v. Sec'y of Health & Human Servs.,* 901 F.2d 1306, 1310 (6th Cir.1990)). Ultimately, "[an ALJ] should explain the consideration given [to a VA disability determination]…." SSR 06–03p, 2006 WL 2329939, at *7 (August 9, 2006).

HALLEX is the "Hearings, Appeals, and Litigation Law Manual" of the SSA.[10] "Through HALLEX, the Deputy Commissioner for Disability Adjudication conveys guiding principles, procedural guidance and information to the Office of Disability Adjudication and

---

9 http://ssa.gov/OP_Home/rulings/rulings-pref.html ("Social Security Rulings are effective upon publication, and the effective date is shown on the first page of each Ruling. Although Social Security Rulings do not have the force and effect of the law or regulations, they are binding on all components of the Social Security Administration (SSA) in accordance with section 402.35(b)(1) of the Social Security Administration Regulations (20 CFR Part 402), and are to be relied upon as precedents in adjudicating other cases.").

10 HALLEX, Hearings, Appeals, and Litigation Law Manual, *available at* http://ssa.gov/OP_Home/hallex/hallex.html.

Review staff…[for]…the hearing, Appeals Council and civil actions levels."[11] However, the Volume that the plaintiff cites, HALLEX II-1-11-12, is inapposite. Previously, "Volume II, Part 1 of HALLEX housed the Circuit Court Case Reporter (CCCR)."[12] However, as of June 21, 2005, the CCCR was removed from HALLEX entirely and "Volume II, Part 1 is being reserved for future use."[13] The plaintiff relies on 11th Circuit precedent that was previously excerpted in this HALLEX volume for support that "'findings of disability by another agency, *although not binding on the Secretary, are entitled to great weight*.'" (DE 13, p. 10) (quoting *Bloodsworth v. Heckler,* 703 F.2d 1233, 1241 (11th Cir.1983) (citation omitted)). Again, the Sixth Circuit has "not specified the weight such a determination should carry…." *Ritchie*, 540 F. App'x at 510. Instead, the Sixth Circuit has specified that a "disability rating by the [VA] is only one factor to be considered in making a social security disability finding." *Ritchie*, 540 F. App'x at 511.

Here, the record shows that the ALJ considered the disability determination of the VA. The ALJ wrote that "the VA determined that the [plaintiff] was disabled due to Agent Orange exposure and PTSD." (Tr. 227). Further, the ALJ wrote that "the [plaintiff] was awarded 70% service-connected disability benefits for PTSD, effective in February 2010." (Tr. 226). The ALJ also cited exhibit 6F, which includes the correspondence from the VA indicating that the plaintiff "has service-connected disability evaluated at 100%." (Tr. 226; 678). The same correspondence details the "special monthly compensation effective February 25, 2010 because [the plaintiff] is housebound," and explains that the plaintiff is "being paid benefits at the 100% rate…because it

---

11 Social Security Administration Office of Hearings and Appeals, HALLEX Volume I, Purpose (March 03, 2011), *available at* http://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html.

12 Social Security Administration Office of Hearings and Appeals, HALLEX Volume II (June 21, 2005), *available at* http://ssa.gov/OP_Home/hallex/TS/tsii-1-07.html.

13 Social Security Administratio n Office of Hearings and Appeals, HALLEX Volume II (June 21, 2005), *available at* http://ssa.gov/OP_Home/hallex/TS/tsii-1-07.html.

has been determined [that the plaintiff is] unable to work due to…service connected disabilities." (Tr. 679). Therefore, the record provides substantial evidence that the ALJ appropriately considered the disability determination of the VA.

The record shows that the ALJ also appropriately explained the less than binding weight he gave to the disability determination of the VA. The ALJ wrote, "this [VA] determination is too remote…." (Tr. 227). As the ALJ explained, the plaintiff was last insured on December 31, 1997, and he needed to "establish disability on or before that date in order to be entitled to [DIB]." (Tr. 219). However, the VA disability determination occurred over a decade later, too remotely for him to assign it more weight (Tr. 227). As the ALJ explained, "PTSD was diagnosed well after the date last insured and there was no opinion as to whether PTSD was present and/or was at a disabling level in 1997." (Tr. 226). The ALJ also explained that the underlying medical records that established disability for the VA "did not establish that the level of physical and mental limitations prior to the date last insured were disabling under Title II disability legal standards." (Tr. 227). Ultimately, "there was no evidence…prior to the date last insured." (Tr. 226). Indeed, the earliest medical record was an echocardiogram report from August 01, 1997 that was not actually entered or signed until December 11, 1999 (Tr. 676-77). The physician entering that report described it as a "[t]echnically very difficult study of poor quality; normal sinus rhythm throughout." (Tr. 676).

Still, the ALJ reviewed records from after the date last insured (Tr. 224-27). Regarding those records, the ALJ explained that the plaintiff "was not seeking treatment for PTSD" before the date last insured; that his "mental functioning ability [before his date last insured] was not at a disabling level to preclude work;" that the plaintiff's "coronary artery disease was stable;" that the plaintiff "denied…any chest pain or [shortness of breath] on exertion;" and that a study "in

2006 demonstrated an excellent exercise capacity." (Tr. 226-27). The record provides substantial evidence that the ALJ was unable to glean, from the records available, any evidence of disability prior to the date last insured, and that he appropriately explained this in his decision.

The record also shows that the ALJ avoided the pitfall of discounting the VA determination because it included conditions that the ALJ did not deem severe. Instead, the ALJ deemed the same conditions, and others, to be severe (Tr. 221). Likewise, the ALJ avoided the pitfall of discounting the VA determination because conditions, in isolation, were less than 100% disabling according to the VA. Instead, the percentage that the VA assigned to the plaintiff's impairments was a non-issue for the ALJ.

Finally, the record shows that the ALJ was aware of the medical consequences of the plaintiff's Agent Orange exposure and PTSD. The ALJ wrote that the plaintiff's "alleged disability…[was] due to ischemic heart disease and [PTSD]." (Tr. 224). He specifically noted the 2009 letter from the VA "indicating that ischemic heart disease was one of the diseases that [the] VA currently presumed resulted from exposure to herbicides like Agent Orange." (Tr. 226). Therefore, while the plaintiff argues that the ALJ failed to address the plaintiff's Agent Orange exposure and PTSD, the record provides substantial evidence otherwise.

Therefore, there is substantial evidence that the ALJ considered the disability determination of the VA, appropriately explained the limited weight he gave it, and addressed the plaintiff's Agent Orange exposure and PTSD. The plaintiff's argument that the ALJ erred in considering or relying on the disability determination of the VA is, therefore, without merit.

### B.     Whether the ALJ failed to appropriately assess the plaintiff's credibility

The plaintiff argues that the ALJ violated SSR 96-7P because he failed to: (1) "evaluate and assess the credibility of the [p]laintiff's statements...;" (2) "make clear the weight accorded

to the [p]laintiff's specific allegations and testimony…;" and (3) "properly consider the consistency of the allegations with his medical evidence and treatment notes." (DE 13, pp. 12-13). These arguments coalesce into the same fundamental argument; that the ALJ failed to appropriately use the 2-part test required under SSR 96-7P and 20 C.F.R. § 404.1529(c).

As part of his argument, the plaintiff focuses on two of the factors that the ALJ considers during the 2-part test; the plaintiff's daily activities and the side effects of medication (DE 13, pp. 13-14). The plaintiff argues that the ALJ inappropriately considered the plaintiff's "minimal activities" and "failed to consider or address [the plaintiff's] reports of ongoing fatigue and only being able to do things for short periods of time." (DE 13, p. 13). The plaintiff also argues that the ALJ failed to consider the plaintiff's side effects in determining credibility under SSR 96-7P and in determining RFC under SSR 96-8p.

Finally, the plaintiff cites Eleventh Circuit law for the notion that "the ALJ's failure to state a reasonable basis for rejecting [the plaintiff's] testimony mandates that it be accepted as true." (DE 13, p. 14).

Pursuant to SSR 96-7P and 20 C.F.R. § 404.1529(c), an ALJ uses a 2-part test to evaluate a plaintiff's symptoms and then considers 7 factors to determine credibility regarding the symptoms. First, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." SSR 96-7P, 1996 WL 374186. Next, "the [ALJ] evaluate[s] the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7P, 1996 WL 374186. A plaintiff's symptoms will limit his ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. SSR

96-7P, 1996 WL 374186. However, if objective evidence does not reflect the severity of symptoms, the ALJ requires other evidence to determine the credibility of a plaintiff's statements about his symptoms. SSR 96-7P, 1996 WL 374186. In those cases, the ALJ must consider: (1) daily activities; (2) location, duration, frequency, and intensity of symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) functional limitations and restrictions. 20 C.F.R. § 404.1529(c). When an "ALJ [has] considered the evidence…and provided specific reasons for his credibility findings, his decision is entitled to great deference and is supported by substantial evidence." *Anthony v. Astrue*, 266 F. App'x 451, 460 (6th Cir. 2008).

The record shows that the ALJ properly evaluated the plaintiff's symptoms and credibility. The ALJ first found that the plaintiff had the severe impairments of coronary artery disease with myocardial infarction, ischemic cardiomyopathy with 5-vessel CABG, stable coronary artery disease, hypertension, colon polyp, and PTSD (Tr. 221). The ALJ found that these "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 226).

Next, the ALJ evaluated the objective medical findings, including medical notes, colonoscopy and echocardiogram results, the discussion of a pacemaker implantation, a nuclear perfusion study, notes from an arrhythmia clinic, primary care nursing notes, and correspondence from the VA (Tr. 224-27). Finding the objective evidence insufficient to determine the severity of symptoms, the record shows that the ALJ also considered the 20 C.F.R. § 404.1529(c) factors and found a lack of credibility, as explained below (Tr. 226).

First, the ALJ considered the plaintiff's daily activities. He wrote that the plaintiff testified that his activities of daily living "were the same now as [in 1997]…." (Tr. 224). The ALJ wrote that in 2011, the plaintiff "admitted he had no problem caring for his personal needs, prepared simple foods…cut the grass…, went outside daily, drove, shopped in stores once a month, and attended church weekly." (Tr. 224). In 2011, he was "able to walk one-quarter of a mile before having to stop and rest [and]…he finished what he started." (Tr. 224). The ALJ wrote that the plaintiff "worked outdoors daily without any problem" in 1999 and that he reported "that he could walk 2 to 3 miles without problems and could climb at least 7 flights of stairs" in 2007 (Tr. 225). The ALJ also wrote that the plaintiff "denied any problems with activities of daily living, problems getting around his home, or with falls…" in 2007 (Tr. 226).

Related to the daily activities, the plaintiff argues that the ALJ "failed to consider or address [the plaintiff's] reports of ongoing fatigue and only being able to do things for short periods of time." (DE 13, p. 13) (citing Tr. 440; 547; 551; 579; 590; 598). The plaintiff relies on *Walston v. Gardner* for support that a plaintiff's ability to "perform simple functions…, does not necessarily indicate that…[he] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by [the plaintiff]." (DE 13, p. 13) (citing *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967)).

This Court has previously distinguished *Walston*, and the *Walston* case is likewise distinguishable here. "In *Walston,* the Court did find that simply because a plaintiff 'can still perform simple functions…,' [it] does not mean that he can engage in substantial activity, but only after the Court found that the plaintiff's testimony that he suffered from intense pain was 'confirmed by every doctor who examined him.'" *Long v. Astrue*, 3:10-0273, 2011 WL 1258407,

at *19 (M.D. Tenn. Mar. 7, 2011) report and recommendation adopted, 3:10-00273, 2011 WL 1258507 (M.D. Tenn. Mar. 30, 2011) (quoting *Walston*, 381 F.2d at 586).

Here, the record does not show that the plaintiff presented to his physicians before his date last insured with reports of pain because, as discussed, there are no records prior to that date. The plaintiff did present to Dr. Nadeau in August, October, and December 2010, September and December 2011, and March and June 2012 with complaints of "non-specific, severe pain if he does anything physical: arms, chest, stomach muscles, back." (Tr. 475; 486; 498; 697; 707; 724; 731). During the hearing, the ALJ specifically mentioned these records, indicating that the records state that the plaintiff "still experience[s] pain in [his] legs, arm, [and] back…." (Tr. 248). The ALJ also noted in his decision that the plaintiff testified about his pain, stating that he had "pain in his legs, arms and back [in 1997] and still does." (Tr. 223). While the record shows that the plaintiff's pain has persisted since 1997, the record also shows that the ALJ took the plaintiff's testimony and Dr. Nadeau's postdated reports about this pain into consideration when evaluating the plaintiff's credibility.

The plaintiff also cites several instances in the record where, he argues, the ALJ failed to consider evidence of the plaintiff's fatigue and inappropriately considered mere intermittent activity (DE 13, p. 13) (citing Tr. 440; 547; 551; 579; 590; 598). The plaintiff argues that the ALJ solely relied on the plaintiff "work[ing] outside daily at one time," walk[ing] 2 to 3 miles, and reporting that he was "doing very well" or "OK" to support the finding that the plaintiff was not disabled (DE 13, p. 13). However, the record shows, as explained herein, that these are far from the only daily activities upon which the ALJ relied. Additionally, the record shows that the ALJ considered the activities of daily living in conjunction with other factors, as outlined below.

The record shows that the ALJ continued to consider the 20 C.F.R. § 404.1529(c) factors, including the location, duration, frequency, and intensity of the plaintiff's symptoms. The ALJ wrote that the plaintiff testified about his "massive heart attack in 1997…which left much nerve damage." (Tr. 223). The ALJ wrote that the plaintiff testified:

> [T]hat he tried to return to work as a painter, but [that he] had no strength in his legs and could not lift anything over his head. He had shortness of breath, and pain in his legs, arms and back at that time and still does. He…also had bouts of dizziness since his heart attack and had fallen more than once…[The plaintiff] also testified that he had symptoms of PTSD since coming home from Vietnam.

(Tr. 223). The record shows that the ALJ also considered precipitating and aggravating factors. The ALJ wrote that the plaintiff testified he "had nightmares, could not sleep, thought he was losing his mind, isolated [himself] from everybody, and had no friends." (Tr. 223). Further, the ALJ wrote that the plaintiff had "memory problems, could not stand being in confined spaces, and had panic attacks…anger problems and problems getting along with supervisors." (Tr. 224).

The record shows that the ALJ considered the type, dosage, effectiveness, and side effects of medication. The ALJ wrote that the plaintiff testified that he "basically took the same medications now as he did [in 1997]." (Tr. 224). The ALJ noted the plaintiff's blood pressure, pain, and cholesterol medicine, documenting that they included "Atenolol…aspirin…[and] Simvastatin." (Tr. 224-25).

The plaintiff argues that the ALJ failed to consider the plaintiff's side effects not only in determining credibility but in determining RFC under SSR 96-8P. The plaintiff cites the same instances in the record where he argued that the ALJ failed to consider the plaintiff's fatigue and activity, and argues that these are also instances where the ALJ failed to consider the side effects of the plaintiff's medication (DE 13, p. 13) (citing Tr. 440; 547; 551; 579; 590; 598).

However, the record shows that the ALJ did consider those parts of the record. The five latter citations are from record exhibit 4F, to which the ALJ repeatedly refers in his decision (Tr. 225-26).[14] The first citation is to a visit from March 25, 2010, when the plaintiff reported that he "[felt] like he ha[d] muscle spasms, pain and muscle tears which may [have] be[en] attributable to [cholesterol medicine]." (Tr. 440). However, as explained above, the record shows that the ALJ considered the plaintiff's report of persistent pain. Therefore, the argument that the ALJ failed to consider the side effects of the plaintiff's medication is without merit.

The record shows that the argument regarding RFC is likewise without merit. Under 96-8P, "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record, such as…[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)…." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A July 2, 1996), at *5. As discussed, the record shows that the ALJ considered the plaintiff's reports of medication related side effects, specifically in the section of his decision where he explains his RFC finding (Tr. 223).

The record shows that the ALJ continued to consider the 20 C.F.R. § 404.1529(c) factors, including the plaintiff's treatment. The ALJ documented that the plaintiff's coronary artery disease was stable and his blood pressure was under "good control" and listed the plaintiff's current medications (Tr. 224-25).

---

14 On May 30, 2006, a provider documented that the plaintiff had some concern about his medication "causing leg pain, but there [was] some doubt about this [and the plaintiff] agree[d] to re-try [the medication] and call i[f] any muscle pain occur[ed]." (Tr. 598). On December 13, 2006, the plaintiff reported "some heel pain" that was "stable." (Tr. 590). On May 25, 2007, the plaintiff reported "dizziness and tiredness due to his blood pressure medication." (Tr. 580). On January 27, 2009, the plaintiff reported the he "[felt] well." (Tr. 547). He reported "fatigue in the mornings," that "it [took] him a while to get going," and that he "continue[d] to work." (Tr. 547). He "denie[d] chest discomfort, [lower extremity swelling, or breathing problems]." (Tr. 547). He reported "'dizzy speels [sic]…[when]…standing up too fast." (Tr. 547).

The ALJ considered measures to relieve pain or other symptoms. The ALJ wrote that the plaintiff had considered a pacemaker in 2006, but "admitted he had not experienced any further heart palpitations since his last visit…walked up hills and had been feeling 'OK.'" (Tr. 225). The ALJ wrote that in November 2006, after an echocardiogram, the plaintiff "was advised to walk 30 to 40 minutes daily." (Tr. 225).

The ALJ considered the plaintiff's functional limitations and restrictions. The ALJ wrote that the plaintiff testified that when he tried to return to work after his heart attack, he "had no strength in his legs and could not lift anything over his head. He had shortness of breath and pain in his legs, arms, and back…and still does. He had…dizziness…and had fallen…." (Tr. 223). The ALJ wrote that the plaintiff testified that in 1997, he could "walk about 30 minutes at a time, then had to rest; stand 30 to 45 minutes at a time, and sit 30 to 60 minutes at a time." (Tr. 223). The ALJ noted that in 2011, the plaintiff reported that he did not "handle stress/changes well and did not get along with authority figures after returning from Vietnam." (Tr. 224).

Finally, the plaintiff argues that the ALJ failed "to state a reasonable basis for rejecting [the plaintiff's] testimony." (DE 13, p. 14). The plaintiff cites an Eleventh Circuit case, *Foote v. Chater*. In *Foote*, the Court found that "[t]he ALJ did not make…specific findings as to [the plaintiff's] credibility." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). The Court found that the ALJ "failed to identify any inconsistencies between [the plaintiff's] statements to her physicians and those she…made to the Secretary…; and no [VE] was called." *Foote*, 67 F.3d at 1562.

Here, however, even if Eleventh Circuit precedent were taken as persuasive, the record shows that the ALJ made specific findings regarding the plaintiff's credibility and identified the inconsistencies between the plaintiff's statements, as outlined at length above. Further, the ALJ

called a VE during the hearing and explicitly noted this testimony in his decision (Tr. 227; 261-67). Therefore, there is substantial evidence that the ALJ did not fail to state a reasonable basis for rejecting, or more accurately, not finding fully credible, the plaintiff's testimony.

The record provides substantial evidence that the ALJ considered all of the evidence in the record and provided reasons for his credibility findings. The plaintiff's argument that the ALJ erred in his credibility analysis is, therefore, without merit.

### C.    Whether the ALJ failed to properly evaluate the opinion of Dr. Nadeau

The plaintiff argues that Dr. Nadeau was a treating physician, that the ALJ erred in rejecting Dr. Nadeau's opinion without "providing sufficient reasons..." and that the ALJ "erred in failing to fulfill his duty to develop the record...." (DE 13, p. 17).

Regarding opinion evidence, "[i]f the ALJ rejects a treating physician's opinion, he or she must provide a basis for this rejection." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009) (citing *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987)). A "treating physician" is a plaintiff's "own physician, psychologist, or other acceptable medical source who provides…or has provided…medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502.[15]

Regarding opinion evidence of disability from after the date last insured, the Sixth Circuit has held that such opinion evidence:  (1) offers "little probative value;" and (2) is only relevant if and where it "relates back" to the plaintiff's limitations before the date last insured, and is indeed

---

15 20 C.F.R. § 404.1502 ("Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s). [An ALJ] may consider an acceptable medical source who has treated or evaluated [a plaintiff] only a few times or only after long intervals…to be [the] treating source if the nature and frequency of the treatment or evaluation is typical for [the] condition(s).").

related to limitations and the severity of those limitations, not merely to impairments, a condition, or a diagnosis. *Lancaster v. Astrue*, 1:07-CV-0044, 2009 WL 1851407, at *11 (M.D. Tenn. June 29, 2009) (quoting *Strong v. Soc. Sec. Admin.,* 88 Fed. Appx. 841, 845 (6th Cir.2004)); *Lancaster*, 1:07-CV-0044, 2009 WL 1851407, at *11 (citing *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988)); See also 20 C.F.R. § 416.945(a)(1).

Regarding development of the record, it is the responsibility of the SSA to develop the plaintiff's "complete medical history" and "make every reasonable effort to help [the plaintiff] get medical reports…." 20 C.F.R. § 404.1512(d). The plaintiff's "complete medical history" means "at least the 12 months preceding the month in which [the plaintiff] file[s] [his] application unless there is a reason to believe that development of an earlier period is necessary or unless [the plaintiff] say[s] that [his] disability began less than 12 months before [he] filed…." 20 C.F.R. § 404.1512(d). "If applicable, [the SSA] will develop [the plaintiff's] complete medical history for the 12–month period prior to…the month . . . [the plaintiff was] last insured for disability insurance benefit." 20 C.F.R. § 404.1512(d)(2) (citing 20 C.F.R. § 404.130).

The plaintiff "bears the ultimate burden to prove by sufficient evidence that [he] is entitled to disability benefits." *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing 20 C.F.R. § 404.1512(a)). The plaintiff must "provide medical evidence showing that . . . [he has] an impairment and how severe it is during the time . . . [he says] that . . . [he is] disabled." 20 C.F.R. § 404.1512(c). Certain circumstances would trigger "a special, heightened duty" to develop the record. *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). "Absent…special circumstances [when a plaintiff is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures]…this court repeatedly affirms that the [plaintiff] bears the ultimate burden of proving disability." *Wilson*, 280 F. App'x

at 459 (citing *Trandafir,* 58 Fed. Appx. at 115). "[T]o establish entitlement to disability insurance benefits, an individual must establish that he became 'disabled' prior to the expiration of his insured status." *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (citing 42 U.S.C. §§ 423(a) and (c); *Higgs,* 880 F.2d at 862).

Here, the plaintiff filed his DIB application on April 29, 2011, claiming an onset date of July 30, 1997 (Tr. 219; 353; 355; 373). Due to this gap of 14 years, the ALJ had reason to believe that the plaintiff's alleged disability began earlier than the 12 months preceding the filing date, rendering earlier medical evidence relevant. Yet, as mentioned, the earliest medical evidence is an echocardiogram report from August 01, 1997 that was not entered or signed until December 11, 1999 (Tr. 676-77).

The record shows that while Dr. Nadeau was a treating physician, he was not a treating physician during the relevant time period. Moreover, the record does not show that Dr. Nadeau's opinions relate back to the date last insured or relate to the plaintiff's limitations during that time. Dr. Nadeau reported the plaintiff's complaints of "non-specific, severe pain if he does anything physical: arms, chest, stomach muscles, back." (Tr. 475; 486; 498; 697; 707; 724; 731). A July 05, 2012 letter from Dr. Nadeau indicates that the plaintiff had a "[heart attack] and [CABG] in [August 1997]" and that the plaintiff "has controlled hypertension and hypercholesterolemia…[and] is 100% disabled from his heart disease and ongoing PTSD…." (Tr. 684). However, the disability described therein refers to the VA disability determination and these records do not demonstrate that Dr. Nadeau recorded the plaintiff's present complaints as they related to limitations that existed in 1997. It is only with the plaintiff's testimony about his persistent pain that the ALJ could connect the dots between 1997 and Dr. Nadeau's reports. Dr. Nadeau's reports alone do not mention 1997 and the pain reported therein is described as "non-

specific." Therefore, the record provides substantial evidence that Dr. Nadeau was not a treating physician during the relevant time and that the ALJ was under no duty to provide a basis for rejecting or choosing not to cite his opinion.

Here, none of the special circumstances that trigger a heightened duty on the part of the ALJ to develop the record are present. The record shows that the plaintiff was not (1) without counsel, (2) incapable of presenting an effective case, or (3) unfamiliar with hearing procedures. Indeed, Ms. Benson represented the plaintiff, was present during the hearing, and had no objections to any of the exhibits entered (Tr. 233; 236). The Magistrate Judge is not persuaded that the plaintiff was incapable of presenting an effective case or that he was unfamiliar with hearing procedures. The ALJ explained, at length, the difficulty of the case given the remote timing of the alleged onset date, and the plaintiff did not express any misunderstanding (Tr. 236-42). Moreover, the ALJ directly asked if there were "any records or…any medical evidence with regard to [the plaintiff's alleged disability related to his coronary function]" and again asked if there were "treatment records that would support that." (Tr. 239; 240). The plaintiff, or his attorney, responded, "No." (Tr. 240). Therefore, the plaintiff presented no medical evidence of his disability prior to the date last insured, despite testifying that he had "been treated at the VA consistently since 1997 when [he] had the heart attack…." (Tr. 257). The ALJ also asked, "a matter of fact question…is there medical evidence or treatment records from 1997 that address PTSD?" (Tr. 241). The plaintiff responded, "There's not." (Tr. 241). Therefore, the record provides substantial evidence that the ALJ did not fail to fulfill his duty to develop the record.

The record provides substantial evidence that the ALJ properly evaluated the opinion of Dr. Nadeau. The plaintiff's argument that the ALJ erred is, therefore, without merit.

## V.     <u>Conclusion</u>

The record provides substantial evidence to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard.

<h2 style="text-align:center">VI.      Recommendation</h2>

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 12) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 10th day of December, 2014.

s/John S. Bryant_____
John S. Bryant
U.S. Magistrate Judge